STATE OF NORTH CAROLINA, EX REL NORTH CAROLINA UTILITIES COMMISSION v. PIEDMONT NATURAL GAS COMPANY, INC.

(Filed 3 May, 1961.)

**1. Utilities Commission § 1—**

> The purpose of regulation of public utilities is to protect the interest of the public to the end that adequate service is provided at reasonable rates, and in fixing such rates the Utilities Commission must be fair to both the producer and to the consumer.

**2. Utilities Commission § 3: Gas § 3—**

> In fixing the rate for a public utility, the Utilities Commission must first ascertain the value of the property used in providing the service, and it may then calculate the rate which will produce a fair return upon such rate base.

**3. Same—**

> In determining the value of the investment of a utility used in providing its services, the Utilities Commission must take into consideration replacement costs in order to determine the present value of the utility's facilities, and evidence of such trended costs deserves weight in proportion to the accuracy of the tests and their intelligent application.

**4. Same: Utilities Commission § 5—**

> Where a utility introduces expert testimony as to replacement costs of its facilities based upon charts and indexes of other utilities of like classification in the same territory, the Utilities Commission must weigh such testimony in the light of the accuracy of the tests and their intelligent application, and it is error of law for the Commission to disregard such evidence or give it only a minimal consideration.

**5. Same—**

> It is error for the Utilities Commission to apply the national average

of promotional costs as conclusive in determining the reasonableness or excessiveness of promotional expenditures by a gas company when the evidence discloses that the company had recently changed over from manufactured to natural gas and was in the process of expanding its facilities into new territory in competition with electricity and oil.

**6. Same—**

Where a utility is currently investing large amounts of capital in expansion, the Utility Commission should determine the capital invested as of the time the rates fixed by it are to be effective, rather than the average net investment of the utility for the entire test year, since the rates fixed are prospective.

**7. Same—**

Where the Utilities Commission fixes the rate base of a utility on the basis of original acquisition cost alone, without taking into consideration replacement costs or capital invested in new construction, the findings of the Commission as to the value of the property used in providing the service is not supported by competent, material and substantial evidence.

**8. Utilities Commission § 3:	Gas § 3—**

In fixing the rate of a public utility, the Utilities Commission should find the fair value of the utility's facilities, its operating expenditures, including capital consumed, and should fix such rate of return on the investment as will enable the utility by sound management to pay a fair profit to its stockholders and to maintain and expand the facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise.

APPEAL by the North Carolina Utilities Commission and North Carolina Association of Launderers and Cleaners, Inc., from *Campbell*, J., MECKLENBURG Superior Court in Chambers, January 16, 1961.

Piedmont Natural Gas Company, Inc., (hereafter called Piedmont) is a New York corporation domesticated and doing business in North Carolina. It originated this proceeding on October 16, 1959, by filing with the North Carolina Utilities Commission (hereafter called the Commission) for its approval, a revised rate schedule showing a general increase in its charges for natural gas service in North Carolina. Piedmont alleged its proposed increased rate was made necessary by the fact that its supplier, Transcontinental Pipe Line Corporation, (hereafter called Transco) had increased its charges for gas by more than $543,000 per year effective November 18, 1959. On November 3, 1959, the Commission, by order, refused to approve the rate increase and initiated this investigation to determine the lawfulness of the proposed rate schedule. Piedmont applied for and was granted permission to put into effect the increased rates under a bond which required a refund of any charges found to be excessive. On December 30, 1959, by order of the Commission, the North Carolina Associ-

ation of Launderers and Cleaners, Incorporated, (hereafter called the Association) a customer of Piedmont, was permitted to intervene and participate in the hearings.

The Commission began its hearings on January 12, 1960. Buell G. Duncan, President of Piedmont, John F. Watlington, Jr., President of Wachovia Bank & Trust Company, E. T. Anderson, Vice President and Treasurer of Piedmont, Edward H. Gannon, Manager of the Utilities Accounting Department of Stone & Webster Service Corporation, Frank B. Muhlfeld, Vice President of Stone & Webster, testified as witnesses for Piedmont. W. H. Cleveland, Senior Accountant on its staff, testified for the Commission.

The evidence disclosed that in May, 1951, Piedmont acquired from Duke Power Company its gas manufacturing, storage and distribution systems located in Charlotte, Salisbury, Spencer, East Spencer, High Point, Greensboro, Winston-Salem, Burlington, and Graham, North Carolina. Likewise Piedmont acquired similar properties located in a number of cities in South Carolina. The discussions hereafter will relate entirely to that part of Piedmont's business in the State of North Carolina.

Immediately after acquiring the properties from Duke, Piedmont began to change over from manufactured to natural gas which it purchased from Transco. The deliveries to Piedmont were made at Transco's appropriate terminal on its pipe line. The conversion over to natural gas was complete in 1952. Piedmont acquired additional facilities for distribution and sale of natural gas to customers in Huntersville, Thomasville, Randleman, and Asheboro. Plans exist for extension of this service to other communities. In order to distribute natural gas, Piedmont has laid approximately 160 miles of lateral pipe line through which it delivers gas from Transco's trunk line.

Prior to October 16, 1959, (effective date of proposed rate increase) Piedmont had operated under a rate schedule which became effective with the Commission's approval in June, 1959. Piedmont's proposed rate increase was triggered by and designed to meet the additional cost of natural gas resulting from Transco's increased rate effective November 18, 1959, with Federal Power Commission's approval. Under Transco's new rate the increased cost to Piedmont for the 12 months test period would have been more than $543,000. In addition, Piedmont would have been due the State of North Carolina more than $24,000 as a gross receipts tax. Piedmont's new rate did nothing more than absorb the increased cost resulting from Transco's rate increase.

For the purposes of the investigation the Commission chose the 12 months ending October 31, 1959, as the test period from which to determine the fair value of Piedmont's property, its operating

revenue, its working capital, its allowable deductions, and the rate required to produce a fair return.

Mr. Duncan, for Piedmont, testified before the Commission:

"On May 18, 1959, Transco filed with the Federal Power Commission, which regulated the rates charged by Transco to its customers including Piedmont, revised tariffs which were made effective November 18, 1959, subject to refund to Transco's customers to the extent not subsequently approved by the Federal Power Commission. Piedmont is presently paying these increased rates and must continue to pay such rates for the natural gas it receives from Transco until the rates are finally determined by the Federal Power Commission. Piedmont has intervened in the proceedings instituted by Transco before the Federal Power Commission and plans to oppose the requested increase in the rates charged by Transco. However, in the meantime we must pay the full amount of the increase in the demand charge and commodity charge proposed by Transco. At this time it is not known what the final decision of the Federal Power Commission will be. In order to protect Piedmont from losses by having to absorb such increase in the charges by Transco, as may be approved by the Federal Power Commission, we must now begin collecting from our customers that increase in operating expenses. . . . If such increase had been in effect throughout the twelve months ending October 31, 1959, the increase in Transco's rates for the twelve months period would have been $647,457; of this amount $535,113 would have been applicable to North Carolina. Due to the six per cent gross receipts tax charged by the State of North Carolina, an additional $32,581 would have to be collected by Piedmont in order to offset the tax payment. Therefore, Piedmont would have to increase its rates $680,038, $567,694 of which is applicable to North Carolina operations, to recover the entire increase in its cost. However, the new rates will produce an increase in revenue of $543,022 in North Carolina, so the company will not recoup all of the increased cost, falling short by $24,672 in North Carolina. . . . It is my opinion that it will be difficult and probably impossible to attract new capital required, even at extremely high interest rates, if we have to absorb any part of the increased payments to Transco . . ."

Mr. Watlington testified: "Piedmont Natural Gas Company, because of the fact that its rate of growth has been high, has tended to make proportionately a larger usage of bank financing than is generally customary in the utility field. . . Today there

exists a substantial demand for funds in relation to the available money in the market. This is caused by the need for funds by new companies and also by the substantial need of old, well-established companies due to expansion and inflation. Therefore, dollars in the securities markets are being actively competed for by many users and this is affected by the rate of earnings of the company. The company with an unfavorable rate of earnings is at a substantial disadvantage in this market. In my opinion, the long term effect would be to increase substantially the financing cost of the company. Obviously the sound and intelligent investor is going to choose the company with an attractive earnings picture and is going to ignore the one with a poor record. This is a more important factor today than it has been at any other time in my experience in banking. I have an opinion as an experienced banker, business man and director of the company as to whether the rate increases requested are necessary. In my opinion, this is of tremendous importance if the company is to continue to be in a position to serve its customers and to contribute materially to the economic expansion of our area. . . ."

Mr. Anderson testified: " . . . I am responsible for the direction of all accounting and financial activities including the keeping of reports to this Commission and other financial and statistical reports of the company. In addition, I have the primary responsibility in the company for the design of gas rates . . . Based on the sales of gas for the Test Year, the New Rates will produce increased revenues of $659,783 for the Total Company and $543,022 for North Carolina only. However, this increased revenue does not completely recover the increased costs to the Company resulting from the Transco rate increase, falling short by $24,672 for North Carolina. . . . In my opinion, the new rates are definitely fair and reasonable. . . . Our gross revenues in 1959 exceed the gross revenues of 1958 by about one million dollars. It would be safe to say the last three years our revenues have increased by at least one million dollars each year. We anticipate that growth right on. We hope for it. But our balance available for common is not going to increase proportionately, 1959 compared to 1958, and after all, that is what we need to attract capital."

Mr. Gannon testified: "I am Assistant Treasurer and also Manager of the Utility Accounting Department and the Special Accounting Department of Stone & Webster Service Corporation. No, sir, I am not qualified and do not propose to testify regard-

ing engineering matters. It is my feeling that I am merely taking the original costs as shown by the books of the company and translating that to prices at the present day. . . . By use of the Handy-Whitman Index, Sir, and I have tested the costs experienced by the company against the Handy-Whitman Index to determine the difference that would exist in the two methods. . . . The Handy-Whitman Index is in common use in the utility field. The purpose of Exhibit 10 is to translate the dollars of original cost of utility property in October 31, 1959, to prices as of the same date based on the Handy-Whitman Index of Public Utility Construction Costs, . . . The term original cost as used herein is the cost of utility plant when first devoted to public service. The Handy-Whitman Index contains public utility costs segregated as to geographical divisions of the United States and the index numbers used in my exhibit are those that pertain to the South Atlantic Division. The State of North Carolina is included in this division of the Index. I used the Handy-Whitman Index in this valuation study because it has been compiled especially for gas and electric utilities and is used not only by the industry but also by a number of public service commissions and many valuation engineers. . . . The original cost of the utilities property applicable to the operation of Piedmont in the State of North Carolina at October 31, 1959, amounted to $24,730,234 and on the basis of this study had an undepreciated trended original cost of $36,881,452. This is exclusive of any amount for going value and working capital. . . . . In my judgment the net trended valuation of $32,570,428 is representative of the present value of the property of the Company in its present physical condition. In other words, the valuation procedure which I have employed translates the original cost of the property to prices as of the present day. That is a method of arriving at a replacement cost depreciated. This constitutes a determination of the current cost valuation of the company's investment used in rendering gas service based on the use of the Handy-Whitman Index."

Mr. Gannon has testified as an expert in respect to the value of utility properties before commissions and courts in many of the states and in three Canadian provinces.

Mr. Muhlfeld testified: "As a Vice President (of Stone & Webster Service Corporation) . . . In connection with my work for clients I have testified before various state public utility commissions regarding the advisability and feasibility of issuing cer-

tain types of securities and also the earnings pattern necessary to attract capital. . . . Basically a gas public utility or, for that matter, any public utility should be allowed a return sufficient to maintain investor confidence in its financial soundness and enable it to finance a necessary expansion program. The crux of the problem in determining the proper rate of return for any utility is the determination of what earnings are required to enable it to compete successfully with other companies for capital. . . . I have made studies to show how Piedmont compares in relation to other companies from the standpoint of earnings coverage of its securities. Piedmont is a straight natural gas distribution company that purchases all of its gas requirements from a pipeline and has annual operating revenues in the range of 10.5 million dollars. Therefore, I have chosen nine companies which in my opinion are comparable with Piedmont. . . . I have prepared Exhibit 11, Sheets 1 to 10, showing the relative position of Piedmont with these nine companies. . . . I must further conclude that the full amount of the rate increase requested by Piedmont is necessary if Piedmont is to compete in the money market on even a reasonably satisfactory basis with other companies . . . When compared with the 8% earnings of the nine selected companies, Piedmont shows actual earnings of 5.4% actual, after giving effect to sale of convertible preferred stock, for the twelve months ending October 31, 1959, and for the pro forma test year before and after the rate increase, earnings of 3.70% and 4.61%, respectively. . . . Inasmuch as this comparison is inclusive of all segments of the capital structure, the earnings shown for Piedmont simply bear out my conclusions that the rate increase being requested in these proceedings is an absolute minimum to permit the company to compete in the money market on any kind of a reasonable basis."

Mr. Cleveland testified for the Commission: "The capital structure of $20,825,399 (Exhibit 1) is result of allocating to North Carolina on a net average investment ratio the capital structure of the total company. The total company capital structure includes capital for merchandising and jobbing, conversion costs, acquisition costs for the property purchased in excess of net original cost, and, of course, construction work in progress on which interest during construction was taken and which has been excluded from the rate base. This construction work in progress for North Carolina alone amounts to $2,104,681. . . . The figure of capitalization referred to (Exhibit 2) is $17,456,014 . . . (the difference is accounted for by) the large amount of construction

work in progress. . . . It is in the capital requirement, but it hasn't produced anything to cover the requirement. It is eliminated out of the capital requirement in Exhibit No. 2. . . . The net operating income adjusted doesn't include earnings to cover that capital. . . . These examinations cover formal matters resulting in rate hearings as well as routine matters. Such examinations are made in the field utilizing company books and records and the reports are prepared in this (Commission's) office."

The intervenor did not offer evidence.

The foregoing is the essence of the evidence which each party illustrated by tables and charts. At the conclusion of the hearing the Commission made detailed findings of fact designed, as it states, to answer two questions: (1) What is the fair value of the properties used and useful in rendering the intrastate service for which the rates and charges are being established? (2) What is a fair rate of return both to the company and to the public based on the established fair value rate base?

The Commission found: "Mr. Gannon was permitted to testify over objections that the undepreciated trended original cost of Piedmont's North Carolina properties, exclusive of any allowance for working capital, was $36,881,452 as of October 31, 1959. After allowances for depreciation reserves based on 'per cent condition' tables, the net trended valuation, according to Witness Gannon, was $32,570,428 as of October 31, 1959.

"Even when performed by qualified engineers and based on actual inspections of the physical properties of the utility, trended original cost studies have been accorded very little weight by the regulatory commissions throughout the country."

With respect to the trended original cost as testified to by Piedmont's witnesses, the Commission said: "The probative force of the evidence of trended original cost which was admitted in the case is minimal, but we have not excluded it from consideration."

During the test period Piedmont actually expended $386,000 on sales promotion. The Commission allowed $200,000 of the amount, eliminating $186,000 on the ground the amount exceeded the national average. The Commission concluded the fair value in its present condition of Piedmont's properties was $18,400,000 and a fair rate of return is six per cent. Based upon the findings, the Commission ordered the proposed new rate canceled, the old rate reinstated, and a refund with interest of all payments in excess of the old rate.

Commissioner Worthington filed a concurring opinion in which he stated:

". . . I concur in the ultimate result reached. It may well be that the assumptions, suggestions and the departure from customary and uniform procedure used and followed in this case will not occur in the future; however, it should be fully understood that my concurrence here does not carry my approval of the drastic departure from customary procedure heretofore followed by the Commission. . . . Of course, if the rates allowed are properly colored within the reasonable predictable future to the extent that there is a tremendous growth in revenue and income of the Company, earnings may be such as to produce a more favorable situation than the present outlook is the case; however, we must always take into consideration the fact that while the rates should be considered in the light of the 'colored by the reasonably predictable future' the same consideration must be given to additional expense in operations and expansion. These things have prime importance but in the light of the upcoming investigation of the company's operations, the actual experience under the increased rates will be available and the effect will be much more readily ascertainable. It does not appear that the rates here allowed will necessarily be confiscatory."

Here are two paragraphs from Commissioner Long's concurring opinion:

"I am well aware that this company has a high debt ratio which tends to minimize the company's requirements for servicing its capital and that the use of debt capital provides the company with a large tax deduction.

"I think is is necessary for a company with so high a debt ratio which faces so much expansion to earn a larger return on its invested capital than the 9 per cent average earned by the Nation's fifty largest and best-established utilities. I am not willing, without evidence, to assume the company's new plant will not produce earnings which, when added to those calculable from the company's old plant, will be entirely adequate, and I do not think the company should expect us to do so."

Chairman Westcott dissented in part, saying:

"It appears to me that the record in this case is deficient for the purpose of rendering a decision at this time, for that it fails to place before us the company's operating experience resulting from the increased cost of gas, on the one hand, and the effect of revenues from a heavy program of construction work in progress

not fully devoted to public use during the test period, on the other hand.

". . . It is my opinion that we should have more conclusive evidence before us before rendering this important decision, particularly in light of the fact that the Commission has directed its Accounting Staff to make an examination of the current operations of the subject company and report to us its findings for the twelve months' test period ending May 31, 1960."

From the Commission's order, Piedmont appealed to the Superior Court of Mecklenburg County upon exceptions to certain findings of fact, to the conclusions of law, to the order cancelling the new and reinstating of the old rate, and requiring refund. After hearing upon the record, Judge Campbell entered judgment reversing the Commission. The part of the judgment requiring review here is quoted:

"NOW, THEREFORE, IT IS CONCLUDED, ORDERED, ADJUDGED, AND DECREED: That the Decision and Order of the Utilities Commission should be, and is hereby, reversed and remanded, for that in said Decision and Order the Commission committed reversible error and the substantial rights of the Appellant have been prejudiced because the findings, inferences, conclusions and decisions of the Order of the Commission fail to comply with the requirements of the General Statutes of North Carolina governing such determinations, are affected by errors of law, are unsupported by competent, material, and substantial evidence in view of the entire record as submitted, and are arbitrary and capricious; in the following respects:

"1. The Order of the Commission erred in fixing the rate base at $18,400,000, and in failing to make a proper and true determination of the fair value of the utility property of Appellant based upon evidence and in compliance with the General Statutes as construed by the Supreme Court of North Carolina. The rate base of $18,400,000 fixed by Order of the Commission represents only a nominal addition to the original cost less depreciation, or book value, of the property, and its determination fails to give effective consideration and weight to the present or replacement cost of the property and other factors, as required by law, the Commission being free to take additional evidence on fair value if deemed necessary.

"2. The Commission failed to give effective consideration and weight to the testimony of witness E. H. Gannon concerning the

present or replacement cost of Appellant's property and the evidence of trended cost developed from the Handy-Whitman Index which translated the original cost of the property into prices as of the present, and failed both in its ruling and finding on said evidence and in its determination of the amount of the rate base to attribute true and effective probative value or force to such evidence.

"3. Inasmuch as the Order in this case does not expressly state how the determination of rate base was made, the Court deems it appropriate to state that in connection with its reconsideration of this cause upon remand, it would not be proper for the Commission to arrive at the fair value rate base by capitalizing earnings under the existing rates at the determined rate of return, or by any such arbitrary calculation whereby rate base is a mathematical product or quotient from other determinations, instead of making, as the law requires, a true finding of the fair value of the property based upon evidence of value independent of other determinations necessary in the proceeding.

"4. Whereas the Commission has the power and right upon a proper showing of excessive and unreasonableness to disallow or reduce a utility's operating expenditures for rate-making purposes, and although Appellant's expenditures for sales promotion during the test year does seem somewhat high to the Court, the competent evidence in this record is not sufficient to clearly establish the excessiveness of the actual expenditure of $386,483.73 for sales promotion by Appellant and an abuse of management's discretion on this matter which the Order held to be 'strongly and peculiarly affected by managerial discretion.' Nor is there sufficient evidence in the record on which to base the finding in the Order that $200,483.73 is a reasonable expenditure for this purpose; the unspecified national average of per customer expenditure for sales promotion purposes relied upon in the Order, without evidence as to the comparability to Appellant of the companies used in the average, or the similarity of the items included under the heading of sales promotion, does not rise to the level of the evidence required as a basis for finding the expenditure of this particular utility excessive and unreasonable, or for fixing the maximum expenditure for rate-making purposes which is determined to be reasonable.

"7. The Order disapproving the new rates and requiring Appellant to absorb the entire increase in the cost of gas erred in that it appears from the record that the old rates, with the addition of the large increase in cost of gas, will not produce suf-

ficient earnings to permit the utility to meet its existing capital requirements and permit proper financing for future expansion, permitting the utility to compete in the market for capital funds, as established by the competent, material, and substantial evidence in the record.

"9. The substantial reliance and weight placed by the Commission on assumption and speculation concerning anticipated future increases in revenues and potential earnings 'which do not appear in the test period or anywhere in the record' in determining the reasonableness of the rate of return fixed and the need for the increased rates, is unsupported by the record and is improper, especially since the Order does not give similar weight and consideration to potential and anticipated increase in costs and expenses. . . . While consideration of the probable earning capacity of the property under the rates proposed and the income to be produced by the greater amount of property in service at the end of the test period is permitted by the law, rates must essentially be regulated on the basis of fixed and known operations and earnings rather than predicted and speculative future operations and earnings without support in the record, inasmuch as the Utilities Commission has the continuing authority to initiate proceedings and order rate reductions at any time actual earnings do in fact increase above a just and reasonable level.

"In view of the disposition made in this Judgment of the major grounds of appeal urged by Appellant and the necessity of remanding the case to the Commission, a ruling upon the other Exceptions of Appellant in this Judgment is not necessary.

"Accordingly the Order of the Utilities Commission is reversed, and this cause is remanded to the Commission for a modification of its Order and a determination of just and reasonable rates, in accordance with the conclusions set forth in this Judgment.

"This the 25th day of January, 1961."

From this judgment the Commission and the Intervenor appealed, assigning errors.

*Winborne, Winborne, & Winborne, for the North Carolina Association of Launderers and Cleaners, Inc., appellants.*

*Thomas Wade Bruton, Attorney General, F. Kent Burns, Assistant Attorney General, for the North Carolina Utilities Commission, appellant.*

*McLendon, Brim, Holderness & Brooks, for defendant, appellee.*

HIGGINS, J.   The right of the State to regulate utility rates springs from the monopolistic character of the business authorized by its franchise. However, the management, operation, and control of the utility are primarily its own business. The purpose of regulation is to protect the public interest and see to it that adequate service is provided at reasonable rates. In return for the franchise, the utility gives up its right to make private rate contracts with its customers, and submits to the regulation of its rates. In exercising regulatory power, the Commission, acting for the State, must be fair both to the producer and to the consumer.

In fixing a rate the Commission must ascertain the value of the property used in providing service. "Necessarily, what is a 'just and reasonable' rate which will produce a fair return on the investment depends on (1) the value of the investment—usually referred to . . . as the Rate Base—which earns the return; (2) the gross income . . . from authorized operations; (3) . . . operating expenses . . . must include amount of capital . . . currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined Rate Base." *Utilities Com. v. State,* 239 N.C. 333, 80 S.E. 2d 133; *Utilities Com. v. Greensboro,* 244 N.C. 247, 93 S.E. 2d 151; *Smyth v. Ames,* 169 U.S. 466, 42 L. Ed. 819; G.S. 62-124. "When these essential ultimate facts are established by findings of the Commission, the amount of additional gross revenue required to produce the desired net return becomes a mere matter of calculation." *Utilities Com. v. State, supra.*

The Commission found $18,400,000 to be the fair value of Piedmont's property in carrying on its business in North Carolina. Piedmont contends the finding is not supported by competent, material and substantial evidence. It argues the Commission set out to have Piedmont absorb Transco's rate increase. To accomplish this result the Commission accepted $1,104,000 (shown by the test period) as the net return. Likewise, it fixed six per cent as the proper rate of return. To justify both figures required a rate base of $18,400,000. As so fixed, the base is a quotient or a forced figure and is not supported by evidence. Piedmont further argues not only the figures but the concurring opinion of Commissioner Worthington and the dissenting opinion of Chairman Wescott support this view. Judge Campbell, in his order of remand, stated: "It would not be proper for the Commission to arrive at the fair value rate base by capitalizing earnings under the existing rates at the determined rate of return or by any such arbitrary calculations whereby rate base is a mathematical product or quotient from other determinations, instead of making, as the law requires, a true finding of the fair value of the property based

upon evidence of value independent of other determinations necessary in the proceeding."

Piedmont claims, and Judge Campbell found, that the rate base of $18,400,000 was the result of calculation, using the company's net profit for the test period, and six per cent as a fair return. These calculations fixed the base rate as stated above. If we disregard the foregoing claims, nevertheless errors of law appear in the Commission's determination. These errors are sufficient to require that the proceeding go back for further consideration and findings. The order reveals the Commission disregarded altogether the evidence of replacement cost in arriving at fair value. Mr. Gannon, specialist in the field of utility accounting since 1937, using authoritative studies by which original cost may be translated into present value, actually fixed the value of Piedmont's property at 32 million dollars. His calculations were based on studies of Piedmont's cost record, as compared with nine other utility companies engaged in like activity in the Southeastern United States. In evaluating this testimony, the Commission said: "Even when performed by qualified engineers and based on actual inspection of the physical properties of the utility trended original cost studies have been accorded very little weight by the regulatory Commissions throughout the country." (Quoting Southwestern Bell Telephone Co., 77 PUR. 33 (Mo.); *Re New Jersey Bell Telephone Co.,* 72 PUR. 49; *Re Narragansett Electric Co.,* 21 PUR. 3rd 113 (R.I.); *Re Montana-Dakota Utilities Co.,* 28 PUR. 3rd 355 (Montana); *Re Central Illinois Elec. & Gas Co.,* 6 PUR. 3rd 108).

"In this case Mr. Gannon freely admitted that he was not a qualified engineer, . . . In short, his was a mere mathematical computation which he could have prepared in his office in New York. . . . Under these circumstances the probative force of the evidence of trended original cost which was admitted in this case is minimal, but we have not excluded it from consideration."

In the case last cited by the Commission in support of its ruling, *Central Illinois Electric and Gas Co.,* 6 PUR. 3rd 108 (Ill. 1954) the Illinois Commission stated: "Evidence of current or reproduction costs and of the observed condition or depreciation of the company's electric, gas and water utility plants was presented by E. H. Gannon (here Piedmont's witness) and L. N. Boisen of Stone & Webster Service Corporation . . . Gannon testified that the current or reproduction cost was determined by trending original costs by accounts and year of installation by the application of the Handy-Whitman Index. . . . While the evidence concerning trended original cost and also concerning the observed depreciation may be open to challenge *in some minor respects* (emphasis added) such evidence does reflect a decrease

in the purchasing power of the dollar and the change in economic conditions and is pertinent to a determination of reproduction cost. Such trended cost must be considered and given appropriate weight in arriving at the fair value of the company's utility plants."

The Commission also cited *In Re Montana-Dakota Utilities Co.*, 28 PUR. 3rd 355 (Mont. 1959) as authority for rejecting the trended original cost as evidence of present value. The case actually held: "While this certainly is a recognized method, we would hesitate to place entire reliance on the trended rate base." These cases are far from holding the evidence is worth no more than "minimal" consideration.

In these times of increased construction costs and decreased dollar value, trended cost evidence deserves weight in proportion to the accuracy of the tests and their intelligent application. The objections to such evidence apparently came from jurisdictions where the base rate is fixed at "book value" or "original cost" rather than present value. Of course, the book value or original cost can be ascertained with exactness from the books and records. Trended cost is useful only when it becomes necessary to fix the present value of facilities constructed when the cost was low and replacement has become expensive — our case. The trended cost takes into account the type of facility, its age, its original and replacement cost, terrain, location, its probable useful life, and other factors. Such evidence is not conclusive but it does appear to be a useful guide in determining value of facilities, most of which are underground and not open to visual inspection. Engineers and accountants have, through examination, investigation and experience in the field, devised tables, studies, and indices designed and intended as guides in translating original cost into present value. A better method, without minute underground examination, is not suggested.

Mr. Gannon's evidence was competent and should have been considered by the Commission on its merits. The Commission, influenced no doubt by other commission holdings in original cost states, gave it only "minimal" consideration and further discredited it by saying it was not altogether ignored. Obviously the Commission brushed the evidence aside as of little or no consequence. We do not undertake to say what weight the Commission should have given Gannon's and Muhlfeld's evidence. What we do say is that it should have been weighed fairly in balanced scales. To give it minimal consideration only constituted error of law. *City of Richmond v. Henrico Co.*, 185 Va. 176, 37 S.E. 2d 873, modified 185 Va. 859, 41 S.E. 2d 35; *Duquesne Light Co. v. Penn Public Utilities Comm.* 176 Pa. Super. 568, 107 A.

2d 745 (1954); *Railroad Commission v. Houston Natural Gas Corporation,* 289 SW 2d 559, 155 Tex. 502.

Piedmont's witnesses, especially Mr. Watlington and Mr. Anderson, testified that six per cent on a rate base of $18,400,000 would not enable Piedmont to compete in the money market for the capital necessary to meet its expanding needs and to enable it to borrow money at a rate appealing to the sound investor rather than at a higher rate demanded by the speculator. In fixing the rate base the Commission appears to have used either its mathematical formula or its imagination instead of evidence to support the findings. The rate base fixed by the Commission is unsupported by competent, material and substantial evidence.

The trial judge also found error of law in the Commission's refusal to allow Piedmont's promotional expenditures as operational costs. Throughout its order the Commission recognizes the high quality of Piedmont's management. The record shows the expenditure was actually made in its promotional activity. The Commission ordered the amount reduced by $186,000, this upon the basis of Cleveland's evidence the percentage expenditure was in excess of the national average for companies retailing natural gas. No effort was made to ascertain the expenditures by companies in Piedmont's class or in its territory. In this connection it must be remembered that Piedmont in 1952 changed over from manufactured to natural gas. All customers had to be sold on natural gas. New customers had to be won. Competition with electricity and oil had to be met. Piedmont is rapidly expanding its facilities by a heavy promotional program. Twenty per cent of its facilities were installed in the last year. Promotional expenditures throughout the nation included many old companies in the field for years with a well known product and an established market. Promotion in a new field faced Piedmont. It is doubtful for that reason whether evidence of the national average should be admitted at all. The average of companies in Piedmont's classification, yes, but the national average, doubtful. The trended original cost evidence which we hold competent was based on the indices and studies of nine companies in Piedmont's classification and in its territory. So Gannon's and Muhlfeld's evidence is not open to the national average objection.

For the purpose of establishing Piedmont's proper rate base the Commission took the average net investment for the test year. Since rates are prospective, the base should have been determined as of the date the rates became effective. Piedmont is a rapidly growing company. Its investment was greatest at the end of the test year. Hence

the investment at that time should be accepted rather than the average for the year.

The Commission has found that six per cent on the investment is a fair net return. But six per cent is meaningless until it is translated into dollars and cents on the basis of a fixed amount of money — in this case capital structure or rate base. The evidence of Piedmont's witnesses fixes the value as high as $32,000,000.00 and at all events greatly in excess of $18,400,000.00.

The Commission's only witness, Mr. Cleveland, does not express any opinion as to the fair value of Piedmont's capital investment. He does not qualify himself to give such opinion. He is an accountant who did nothing more than examine the books, make notes, go back to his office and prepare the charts used in his testimony. The books show only acquisition cost, and even the new construction is not included for the reason that "it is not yet producing income." Neither does Mr. Cleveland ascertain the amount of capital consumed in operating the business.

On the record, we must agree with Judge Campbell's finding that a rate base of $18,400,000 is not supported by competent, material and substantial evidence. We, therefore, agree with the Judge and Chairman Westcott that the proceeding should be remanded for such further study and up-to-date findings as will enable the Commission (1) to find the fair value of Piedmont's facilities; (2) to ascertain its operating expenses, including capital consumed; (3) to fix such rate of return on the investment as will enable Piedmont by sound management to pay a fair profit to its stockholders and to maintain and expand its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise. *Utilities Com. v. State, supra; Corporation Com. v. Mfg. Co.,* 185 N.C. 17, 116 S.E. 178.

We have pointed out some of the particulars wherein we think the Commission has failed to follow the statutory rules as interpreted in our decided cases. In doing so we do not promulgate any new rules. Neither is it our intention to enlarge or restrict the application of old ones.

For the reasons indicated, the order of remand entered in the superior court is

Affirmed.