STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION and RUFUS L. EDMISTEN, ATTORNEY GENERAL v. MEBANE HOME TELEPHONE COMPANY

No. 56

(Filed 4 September 1979)

1. **Telecommunications § 1.3; Utilities Commission § 26— indicators of fair value—credibility and weight**

It is the clear intent of former G.S. 62-133(b)(1) that the Utilities Commission use its own expert judgment as to the credibility of the evidence in the record and the weight to be given it in considering the indicators of fair value which are themselves supported by competent and substantial evidence, and while the Commission may not brush aside one of the prescribed indicators by giving it "minimal consideration," the appellate court will not disturb an order of the Commission merely because it would have given a different weight to each of the indicators of fair value.

2. **Telecommunications § 1.3; Utilities Commission § 26— meaning of "fair value"**

The "fair value" of a utility system cannot exceed the present cost of constructing a substitute system of modern design.

3. **Telecommunications § 1.3; Utilities Commission § 30— replacement cost—consideration of obsolescence**

When a utility's expert witness fails to take obsolescence into account in calculating replacement cost, this is a fact which the Utilities Commission may properly consider in weighing replacement cost to arrive at fair value.

4. **Telecommunications § 1.4; Utilities Commission § 30— 10% weighting to replacement cost—consideration of ratio of equity to debt**

Assuming that the Utilities Commission considered evidence of a telephone company's low ratio of equity to debt in its determination of the fair value of the company's property and that it was error to do so, the Commission did not act either arbitrarily or capriciously in giving only a 10% weighting to replacement cost and a 90% weighting to original cost where there was ample evidence in the record that the company's estimates of replacement cost were improperly calculated and based on inaccurate and incomplete information and that replacement cost should be substantially discounted as an indicator of fair value.

5. **Telecommunications § 1.9; Utilities Commission § 56— weighting of indicators of fair value—appellate review**

Appellate courts will reverse the Utilities Commission because of its weighting of the respective indicators of fair value only if the weighting is arbitrary or capricious, lacking support in the evidence in view of the entire record, or otherwise affected by errors of law. G.S. 62-94.

Utilities Comm. v. Telephone Co.

6. **Telecommunications § 1.4; Utilities Commission § 28— weighting of replacement cost and original cost—debt to equity ratio**

Had the Utilities Commission based its weighting of replacement cost and original cost of a telephone company's property on the percentages of debt and equity in the company's capital structure, such action would represent the impermissible use of a mathematical formula to determine fair value and would have constituted prejudicial error.

7. **Telecommunications § 1.4; Utilities Commission § 30— 10% weighting of replacement cost—no "minimal consideration" of replacement cost**

The Utilities Commission's 10% rating of replacement cost in determining the fair value of a telephone company's property did not result in that indicator being given only "minimal consideration" where the record shows that the Commission carefully considered the company's estimate of replacement cost and decided against a substantial weighting of that figure only after concluding that the company's estimate was inacccurate and that a lesser weighting was justified by additional evidence in the record.

8. **Telecommunications § 1.6; Utilities Commission § 35— excessive plant investment—exclusion from rate base**

The evidence supported a finding by the Utilities Commission that 1000 lines and terminals owned by a telephone company were not used and useful in providing telephone service and should be excluded from the company's rate base as excessive plant investment where there was evidence tending to show that the company ordered a 5500-line electronic central office for cut-over in 1976; this order was based upon a predicted growth of 400 main stations per year, but there was no historical support for a growth rate that high; shortly after the order was placed the country entered a recession and public demand for telephone service fell sharply; a reasonable growth rate for the company at the time it placed its order was only 250 main stations per year; and in early 1974 the company was given an opportunity by the manufacturer to reduce its order to 4500 lines but declined to do so.

9. **Telecommunications § 1.8; Utilities Commission § 42— return on original cost common equity**

A finding by the Utilities Commission that a return of 14.76% on original cost common equity of the Mebane Home Telephone Company was fair and reasonable was supported by an expert's testimony that the cost of equity for two larger telephone companies operating in North Carolina was 12.75%; that because a small utility like Mebane poses greater risks to the investor, a risk premium of 2 to 3% should be added; and that while a high ratio of debt to equity such as shown by Mebane is ordinarily associated with increased risk, Mebane's affiliation with the Rural Electrification Association has effectively reduced much of the risk its stockholders would otherwise face.

Justice BRITT and BROCK did not participate in the consideration or decision of this case.

APPEAL by Mebane Home Telephone Company under G.S. 7A-30(3) from the decision of the Court of Appeals, reported in 35 N.C. App. 588, 24 S.E. 2d 165 (1978), affirming the order of the North Carolina Utilities Commission allowing an increase in rates for telephone service, docketed and argued as Case No. 12 at the Fall Term 1978.

Mebane Home Telephone Company is a public utility based in Mebane, North Carolina. It provides telephone service for an area of approximately 150 square miles in portions of Alamance and Orange Counties. At the end of the test year in May 1976, the Company was serving 5676 stations, of which approximately 3798 were main stations (i.e., primary telephones). It had 24 employees at an average annual salary of $10,269.34.

On 13 August 1976 the Company filed an application for authority to increase its rates to bring in approximately $340,061 in additional gross revenues. Upon order of the Commission, the Attorney General was allowed to intervene on behalf of the consuming public. The public hearing on petitioner's application began on 4 January 1977 and was concluded on January 10th. On 4 March 1977 the Commission filed its order setting rates and charges. Its findings of fact and conclusions pertinent to this appeal are quoted below:

"3. That the last rate increase approved for Mebane Home became effective April 1, 1968, and that in March 1976 the Commission reduced Mebane Home's rates by $3,246 annually in order to offset a portion of an anticipated intrastate toll rate increase.

"4. That the overall quality of service provided by Mebane Home to its customers is adequate.

"5. That as of December 31, 1976, the Company had excess plant investment consisting of 1,000 lines and terminals amounting to $175,639, which was not used and useful in rendering telephone service.

"6. That the original cost of Mebane Home Telephone Company's investment in telephone plant used and useful in providing service in North Carolina is $5,030,501. From this amount should be deducted the reasonable accumulated provision for depreciation at May 31, 1976, of $1,083,907, resulting in a reasonable original cost less depreciation of $3,946,594. . . .

"9. That the reasonable replacement cost less depreciation of Mebane Home's plant used and useful in providing telephone service in North Carolina is $4,244,361.

"10. That the fair value of Mebane Home's plant used and useful in providing telephone service in North Carolina should be derived by giving 9/10 weighting to the reasonable original cost less depreciation of Mebane Home's plant in service and 1/10 weighting to the depreciated replacement cost of Mebane Home's plant. Using this method, with the depreciated original cost of $3,946,594 and the depreciated replacement cost of $4,244,361, the Commission finds that the fair value of Mebane Home's utility plant in North Carolina is $3,976,371. This fair value includes a reasonable fair value increment of $29,777.

"11. That the fair value of Mebane Home Telephone Company's plant in service to its customers in North Carolina at the end of the test year of $3,976,371, plus the reasonable allowance for working capital of $73,355 and the investment in Rural Telephone Bank Class B stock of $118,500, yields a reasonable fair value of Mebane Home's property in service to North Carolina customers of $4,168,226. . . .

"14. That cost-free funds arising from the Job Development Investment Tax Credit, implemented by the Revenue Act of 1971, should be included in the capital structure at zero cost.

"15. That the capital structure which is proper for use in this proceeding is as follows:

| "Item | Percent |
|---|---|
| (a) | (b) |
| Long-term debt | 81.86% |
| Common equity | 10.28% |
| Cost-free capital | 7.86% |
| Total | 100.00% |

"16. That when the excess of fair value rate base over original cost net investment (fair value increment) is added to the equity component of the original cost net investment, the fair value capital structure is as follows:

| "Item | Percent |
| --- | --- |
| (a) | (b) |
| Long-term debt | 81.28% |
| Common equity | 10.92% |
| Cost-free capital | 7.80% |
| Total | 100.00% |

"17. That the Company's proper embedded cost of total debt is 3.56%. The fair rate of return which should be applied to the fair value rate base is 4.40%. This return on Mebane Home's fair value property of 4.40% will allow a return on fair value equity of 13.80% after recovery of the embedded cost of debt. A return of 13.80% on fair value equity results in a return of 14.76% on original cost common equity.

"18. That Mebane Home should be allowed an increase in additional annual gross revenues not exceeding $151,135 in order for it to have an opportunity through efficient management to earn the 4.40% rate of return on the fair value of its property used and useful in serving its customers."

From the order of the Commission granting only a portion of the requested increase in rates, the Company appealed to the Court of Appeals assigning errors in the Commission's exclusion of certain items from the rate base, its determination of "fair value," and its calculation of a fair rate of return. The Court of Appeals affirmed the order of the Commission, and the Company appealed as a matter of right to this Court. By order of the Commission the authorized increases were made applicable to all bills rendered on and after 4 March 1977.

*Rufus L. Edmisten, Attorney General, Jesse C. Brake, Special Deputy Attorney General, and Francis W. Crawley, Associate Attorney, for Attorney General of North Carolina, plaintiff.*

*Robert P. Gruber, General Counsel, and Antoinette R. Wike, Assistant Commission Attorney for North Carolina Utilities Commission, plaintiff.*

*Boyce, Mitchell, Burns & Smith by F. Kent Burns and James M. Day for defendant.*

SHARP, Chief Justice.[1]

## I.  DETERMINATION OF "FAIR VALUE"

In the hearing which gave rise to this appeal, the Utilities Commission found that the reasonable original cost, depreciated, of Mebane Home Telephone's property in North Carolina was $3,946,594 and that the depreciated replacement cost was $4,244,361. Having made these preliminary findings, the Commission concluded that the "fair value" of Mebane's property should be derived by giving a 1/10 weighting to depreciated replacement cost and a 9/10 weighting to original cost. To the figure obtained from this weighting ($3,976,371) it added an allowance for working capital of $73,355 and investment in Rural Telephone Bank Class B stock of $118,500 to reach a "reasonable fair value" of $4,168,226. The weighting process used by the Commission resulted in a "fair value increment" of $29,777. The Commission also found that Mebane Home Telephone's capital structure consists of 81.86% long-term debt (largely in the form of low-interest loans from the REA), 10.28% common equity, and 7.86% cost-free capital.

In its second assignment of error, which we elect to consider first, Mebane contends that the Commission improperly based its weighting of original cost and replacement cost on the Company's ratio of debt to equity and that this resulted in Mebane's estimates of replacement cost being given only "minimal consideration."

Under the statutory scheme in effect at the time Mebane filed its application, its rates were set in accordance with the formula of "a fair return on fair value," a test first set down by the U.S. Supreme Court as a constitutional requirement in *Smyth v. Ames*, 169 U.S. 466, 42 L.Ed. 819, 18 S.Ct. 418 (1898). In *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 88 L.Ed. 333, 64 S.Ct. 281 (1944), the Supreme Court decided that this test was no longer required by the due process clause. Notwithstanding, at the time Mebane filed its application for a rate increase, it was still followed in this State as a matter of

---

1. This opinion was written in accordance with the Court's decision made prior to Chief Justice Sharp's retirement and was adopted by the Court and ordered filed after she retired.

statutory law.[2] At that time, the statute which controls this case, G.S. 62-133, read in pertinent part as follows:

§ 62-133. How rates fixed.—(a) In fixing the rates for any public utility subject to the provisions of this Chapter, other than motor carriers and certain water and sewer utilities, the Commission shall fix such rates as shall be fair both to the public utility and to the consumer.

(b) In fixing such rates, the Commission shall:

(1) Ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or by any other reasonable method.

(2) Estimate such public utility's revenue under the present and proposed rates.

(3) Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

(4) Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain

---

2. "Fair value" is a concept unique to rate-making. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 339, 189 S.E. 2d 705, 719 (1972). The difficulties it poses for both the Utilities Commission, which must subjectively weigh the statutory indicators of value in determining fair value, and for the reviewing court are amply illustrated by the instant case. Effective as to rate applications filed on and after 1 July 1979, the legislature has eliminated "fair value" as the criterion for determining the utility's rate base and substituted in its place "the reasonable original cost of the public utility's property." N.C. Gen. Stat. § 62-133(b)(1) (Cum. Supp. 1977); 1977 N.C. Sess. Laws, ch. 691.

We note, therefore, that the issue raised in this case as to whether the Commission may properly consider a utility's capital structure in its weighting of replacement and original cost is not likely to arise again.

its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

This statute directs the Utilities Commission to "consider" both original cost and replacement cost in ascertaining fair value. However, neither of these is the measure of "fair value." They are merely evidence of that figure to be considered by the Commission in the exercise of its independent expert judgment. *Utilities Commission v. Power Co.*, 285 N.C. 398, 412, 206 S.E. 2d 283, 294 (1974); *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 339, 189 S.E. 2d 705, 719 (1972).

[1] It is the clear intent of former G.S. 62-133(b)(1) that the Commission use its own expert judgment as to the credibility of the evidence in the record and the weight to be given to it in "considering" the indicators of fair value which are themselves supported by competent and substantial evidence. *Utilities Commission v. Power Co.*, 285 N.C. 377, 389-90, 206 S.E. 2d 269, 278 (1974); *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 358, 189 S.E. 2d 705, 730 (1972). While the Commission may not brush aside one of the prescribed indicators by giving it "minimal consideration,"[3] this Court will not disturb an order of the Commission merely because we would have given a different weight to each of the indicators of fair value. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 339, 189 S.E. 2d 705, 719 (1972). It is the prerogative of the Commission to determine the credibility of the evidence, even when the evidence is uncontradicted by another witness. *Utilities Commission v. Power Co.*, 285 N.C. 377, 390, 206 S.E. 2d 269, 278 (1974).

Our review of the record in the instant case reveals ample support for a substantial discounting of replacement cost as an indicator of fair value. Among the factors the Commission considered in judging the credibility of Mebane's estimate of replacement cost and then weighing that figure to arrive at "fair value" were (1) the failure of the Company's expert witness to take ob-

---

3. *Utilities Commission v. Power Co.*, 285 N.C. 377, 390, 206 S.E. 2d 269, 278 (1974); *Utilities Commission v. Gas Co.*, 254 N.C. 536, 550, 119 S.E. 2d 469, 479 (1961).

solescence into account in calculating replacement cost, (2) the lack of reliable data upon which to base a proper study of that figure, and (3) the fact that Mebane had recently made a major replacement to plant in the form of a new million dollar central switching office.

The Chief of the Operations Analysis Section for the Utilities Commission, Allen L. Clapp, testified that the Company's expert witness had overstated replacement costs by calculating a trended *reproduction* cost for Mebane's plant in service and then using that figure as an approximation of *replacement* cost, with no deduction for obsolescence. The Commission indicated in the discussion of its findings and conclusions that it had considered this oversight in weighing replacement cost to arrive at "fair value":

> Although the term "replacement cost" envisions replacing the utility plant in accordance with modern design techniques and with the most up-to-date changes in the art of telephony, trended original cost as presented by the Company is founded upon the premise of duplication of much of the plant as is, with certain inefficiencies and outmoded designs included. While obsolescence can, to an extent, be accounted for in proper depreciation treatment, the economies of scale inherent in the telecommunications industry (*e.g.*, employing one 600-pair cable down a road instead of six 100-pair cables installed over a number of years) are not fully recognized in the trending process.

[2, 3] Obviously, the "fair value" of a utility system cannot exceed the present cost of constructing a substitute system of modern design. *Utilities Commission v. Power Co.*, 285 N.C. 377, 392, 206 S.E. 2d 269, 279 (1974). When a utility's expert witness fails to take obsolescence into account in calculating replacement cost, this is a fact which the Commission may properly consider in weighing replacement cost to arrive at fair value. *Utilities Commission v. Power Co.*, 285 N.C. 398, 410-11, 206 S.E. 2d 283, 292-93 (1974); *Utilities Commission v. Power Co.*, 285 N.C. 377, 390-92, 206 S.E. 2d 269, 278-79 (1974).

Mr. Clapp also testified that he had serious misgivings as to the accuracy of the data upon which the Company's expert witness based his study of replacement costs. He testified that "a

major culprit, if not the major culprit, in causing the problems with the Company's reproduction cost study [was] not the witness' methods but . . . the appalling lack of Company plant construction records and data."

As this Court observed in *Utilities Commission v. Gas Co.*, 254 N.C. 536, 550, 119 S.E. 2d 469, 479 (1961), "trended cost evidence deserves weight [only] in proportion to the accuracy of the tests [used] and their intelligent application." The burden of proving the need for a rate increase is on the utility. G.S. 62-75, 62-134(c); *Utilities Commission v. Railway*, 267 N.C. 317, 148 S.E. 2d 210 (1966). When a utility fails to present convincing evidence of an increase in the value of its property above its original cost, it cannot complain when the Commission discounts the rate base accordingly.

In September 1973 Mebane purchased a new 5500-line electronic switching center, the Stromberg-Carlson ESC-1—PL2. This million dollar addition to plant constitutes almost 1/4 of Mebane's total investment in plant and equipment. Both the Commission staff and the Company's expert witness included it in their estimates of replacement cost at its untrended, undepreciated cost. In consequence, there is only a $297,767 difference between the Company's original costs and its replacement costs as determined by the Commission. Given the relatively small discrepancy between the Company's replacement costs and its original costs, we find unconvincing Mebane's argument that the Commission's determination of fair value seriously understates the value of its investment.

[4] In discussing the evidence bearing upon the weighting of replacement costs, the Commission made the following comments regarding Mebane's high ratio of debt to equity:

> The process of weighting replacement cost less depreciation and original cost less depreciation in determining fair value allows the Commission to exercise its judgment with respect to the reliability of the replacement cost estimates and to the degree to which the Company should be compensated for inflation. Since it is impossible to compensate bondholders after the fact for the effects of inflation upon their investment because of their contracturally [sic] fixed rate of return, it is only necessary to consider compensation to the

stockholders. A weighting of replacement cost equal to the
equity ratio of the capital structure would indicate a 100%
compensation for inflation of the equity investment in plant
and a complete confidence in the reliability of all replacement
cost estimates. A greater weighting to replacement cost
would overcompensate the equity holders since the return
earned on the portion of the fair value increment which was
supplied by debt holders would accrue to the equity holders
in addition to the return on the equity investment.

Because one of the purposes of the fair value formula is com-
pensation for the equity investor for the effects of inflation, con-
sideration by the Commission of the relative percentages of debt
and equity in the Company's capital structure has some practical
appeal. However, as the Commission itself recognized in a discus-
sion of its findings and conclusions:

> [A] blind weighting of the replacement cost and the
> original cost in the same proportion as the equity and debt
> portions of the capital structure would merely reduce to a
> mathematical formula the exercise of the Commission's judg-
> ment. [It would require] the Commission to assume that the
> original cost figures were exactly correct; that the equity
> holders should be protected completely from the effects of in-
> flation; that the effects of inflation are known; that the deter-
> mination of replacement cost is completely reliable; and that
> the depreciation reserves of both original cost and replace-
> ment cost reflect precisely the degree of wear and tear, ob-
> solescence and other factors that are supposed to be
> reflected in these accounts. Its use would also preclude the
> Commission from considering such factors as age and condi-
> tion to the extent that it is not properly reflected in the ac-
> counts.

Carried to its logical extreme, a misplaced reliance on such
evidence could lead the Commission to place an upper limit —
based on the percentage of common stock in the utility's capital
structure — on the weight to be accorded replacement cost in the
determination of fair value. Moreover, such an approach disrupts
the statutory scheme established by former G.S. 62-133 insofar as
it encourages the Commission to "look ahead" at the time it ascer-
tains fair value to the ultimate dollar return to which the com-

pany will be entitled. Clearly, the legislature intended for the Commission to ascertain the "fair value" of the utility's property *before* it attempts to ascertain what would be a "fair return" on the utility's investment.

It is not entirely clear from the record what weight, if any, the Commission ultimately gave the evidence concerning Mebane's low ratio of equity to debt in its determination of fair value. However, assuming *arguendo* that the Commission considered this evidence and that it was error to do so, that fact alone will not require reversal of the Commission's decision.

[5] The determination of the weight to be accorded replacement cost rests in the discretion of the Commission. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 358-59, 189 S.E. 2d 705, 730-31 (1972). Recognizing that the Commission has accumulated substantial expertise through its experience in supervising the public utilities of this State and that it should ordinarily be free to exercise that discretion, the scope of our review is narrow. Appellate courts will reverse the Commission because of its weighting of the respective indicators of fair value only if the weighting is arbitrary or capricious, lacking support in the evidence in view of the entire record, or otherwise affected by errors of law. G.S. 62-94; *Utilities Commission v. Power Co.*, 285 N.C. 398, 411, 206 S.E. 2d 283, 293 (1974).

[4] Considering the record in the case before us, we cannot say that the Commission acted either arbitrarily or capriciously in weighting replacement cost at 10% of fair value. There was ample expert opinion testimony in the record to the effect that the Company's estimates of replacement cost were improperly calculated and based on inaccurate and incomplete information. Even in the absence of such expert testimony, the Commission would have been free to judge the credibility of the Company's estimates for itself and to discount the weight given to replacement cost accordingly. *Utilities Commission v. Power Co.*, 285 N.C. 377, 390, 206 S.E. 2d 269, 278 (1974). Because of the recent addition of a new central switching office, it is also clear that inflation had taken a relatively minor toll on the value of the Company's investment. The Commission's weighting of replacement cost is therefore fully supported by competent evidence. Under these cir-

cumstances we will not presume that incompetent evidence affected the result.

[6] Had the Utilities Commission based its weighting solely on the percentages of debt and equity in the Company's capital structure, as alleged by Mebane, such action would represent the impermissible use of a mathematical formula to determine fair value and would have constituted prejudicial error. *Utilities Commission v. City of Durham*, 282 N.C. 308, 324-25, 193 S.E. 2d 95, 107 (1972); *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 358, 189 S.E. 2d 705, 730 (1972). However, the Commission expressly rejected any "blind weighting" of replacement and original cost in proportion to the percentages of debt and equity in the Company's capital structure. Given this statement by the Commission and the presence of substantial additional evidence in the record which would justify a material discounting of replacement cost, we must assume that any similarity between the weight accorded replacement cost and the percentage of common stock in Mebane's capital structure is coincidental.

[7] Appellant's final objection under this assignment of error is addressed to the end result. Mebane contends that the Commission's 10% weighting of replacement cost resulted in that indicator of value being given only "minimal consideration."

In the case which gave rise to the requirement that replacement cost be accorded more than "minimal consideration," the Commission had largely ignored the utility's estimate of that figure on the grounds that replacement cost was an inherently unreliable measure of value. *Utilities Commission v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469 (1961). The directive of that case is not that replacement cost must be given any particular weighting, but rather that in each case the Commission must consider the estimates of replacement cost on their merits and give the evidence the weight it deserves "in proportion to the accuracy of the tests [used] and their intelligent application." 254 N.C. at 550, 119 S.E. 2d at 479.

It is apparent that the Commission in the case before us carefully considered the Company's estimate of replacement cost and decided against a substantial weighting of that figure only after concluding that the Company's estimate was inaccurate and that a lesser weighting was justified by additional evidence in the

record. Under these circumstances, we cannot say that a 10% weighting of replacement cost constitutes only "minimal consideration."

Mebane's second assignment of error is overruled.

## II.   EXCLUSION FROM THE RATE BASE

[8]   The Commission excluded from the rate base as excess plant investment 1000 lines and terminals which the Commission determined were not "used and useful" in rendering telephone service. This resulted in a reduction in fair value of $175,639. Mebane contends that these items should have been included in the rate base and that it is being penalized for failing to anticipate a downturn in the economy which has only become apparent through hindsight. We disagree.

Under former G.S. 62-133(b)(1) property is includable in the rate base only if it is "used and useful" in providing service to the public as determined at the end of the test period. *Utilities Commission v. Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974); *Utilities Commission v. Morgan, Attorney General*, 277 N.C. 255, 177 S.E. 2d 405 (1970); *Utility Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966). A "telephone company, with central office equipment sufficient to serve any reasonably anticipated increase in customers, may not properly add to its rate base additional units of central office equipment merely because in the long future, it hopes to have customers who will use it." *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 353, 189 S.E. 2d 705, 728 (1972). This does not mean, however, that a utility can never purchase plant or equipment in anticipation of future needs. As we stated in *Utilities Commission v. Telephone Co.*, 281 at 352, 189 S.E. 2d at 727:

> [A] public utility is under a present duty to anticipate, within reason, demands to be made upon it for service in the near future. Substantial latitude must be allowed the directors of the utility in making the determination as to what plant is presently required to meet the service demand of the immediate future, since construction to meet such demand is time consuming and piecemeal construction programs are wasteful and not in the best interests of either the ratepayers or the stockholders. However, Commission action

deleting excess plant from the rate base is not precluded by a showing that present acquisition or construction is in the best interests of the stockholders. The present ratepayers may not be required to pay excessive rates for service to provide a return on property which will not be needed in providing utility service within the reasonable future. (Citations omitted.)

Both the Commission and the courts recognize that predictions of the economic future can never be exact. A utility should not be penalized because its reasonable predictions have failed to materialize. The question for the Commission is whether the utility's expenditures were reasonable in the light of circumstances which the Company knew or should have known at the time it made its purchase.

In September 1973 Mebane ordered a new 5500-line electronic central office for cut-over in November 1976. This order was based upon a predicted growth rate of 400 main stations (i.e., primary telephones) per year. In making this prediction the Company relied on (1) an engineering report prepared by a consulting firm in 1972, (2) the entry of new industries in the service area, and (3) optimistic forecasts of future growth by area businessmen.

Shortly after the order was placed the country entered a recession and public demand for telephone service fell sharply.

Benjamin R. Turner, a telephone engineer employed by the Commission, testified that — notwithstanding the recession — based on information available to the Company in September 1973, its predicted growth rate was far in excess of any reasonably anticipated increase in demand:

> At the time the Company was planning construction of the new central office, the annual growth rate was equal to 265 main stations, new housing developments were planned and Mebane was generally regarded as a good location for new business; however, these factors do not justify a growth rate of 400 main stations per year. Particularly because there is no historical support for a growth rate that high. For example, the annual growth rate was 156 in 1968, 130 in 1969, 111 in 1970, 163 in 1971, 265 in 1972, and 161 in 1973. The highest growth occurred in 1972 the year before the order

for the new central office was placed. The order was placed in September 1973 after the growth rate had fallen to a level of 161 new main stations per year. This should have been an indication to the Company that the forecasted growth rate of 400 main stations per year was in need of a downward adjustment.

In the light of these facts, he concluded that a reasonable growth rate for the Company at the time it placed its order would have been 250 main stations per year. He also noted that the engineering study on which the Company based its prediction was compiled 18 months prior to the placement of its order. In the year preceding the purchase, the rate of growth began to turn downward. In early 1974 the Company was given an opportunity by the manufacturer to reduce its order but declined to do so. It was the difference in cost between this proposed order of 4500 lines and the actual order of 5500 lines that the Commission excluded from the rate base.

The staff expert's testimony provides substantial, competent evidence in support of the Commission's findings. When the Commission's exclusion of specific property from the rate base is supported by such evidence, it is binding on this Court. *Utilities Commission v. Telephone Co.*, 281 N.C. at 354, 189 S.E. 2d at 728.

Assignment of error No. 1 is overruled.

### III. FAIR RATE OF RETURN

[9] In its final assignment of error, Mebane contends that the Commission's determination of a fair rate of return is not supported by competent evidence. The Commission found that a return of 4.40% on the fair value of Mebane's property would be fair and reasonable. It also found that such a return would allow a 14.76% return on original cost common equity. The Company sought a rate of return on original cost common equity of 18.19% but offered no supporting testimony.

The applicable statutory provision is former G.S. 62-133(b)(4) which directs the Commission to:

Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing

economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

The setting of rates which are "reasonable and . . . fair" to both the public and the investor requires an exercise of judgment. No rate of return can be fixed which will be appropriate for all utilities or for a single utility company at all times. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 340, 189 S.E. 2d 705, 720 (1972).

The Utilities Commission based its findings in the present case largely on the testimony of Mr. H. Randolph Currin, Senior Operations Analyst for the Commission. Testifying that it was difficult to estimate Mebane's cost of equity directly since its stock is not widely traded, Mr. Currin first determined the cost of equity for two other telephone companies operating in North Carolina, Central Telephone and Western & Westco. Recognizing that a small utility like Mebane poses greater risks for the investor, and using the larger companies' cost of equity (12.75%) as a "minimum starting point," he then recommended the addition of a risk premium of 2 to 3%.

Although a high ratio of debt to equity is ordinarily associated with increased risk, *see Utilities Commission v. Telephone Co.*, 281 N.C. at 341, 189 S.E. 2d at 720, Mr. Currin testified that Mebane's affiliation with the Rural Electrification Association (REA) effectively reduced much of the risk its stockholders would otherwise face:

> [T]he Company has been able to finance its construction with 35-year REA notes, historically, at an interest rate of only 2%, and more recently, at a rate of 5.5%, resulting in an embedded cost of debt of only 3.56%. . . .

> In addition to the very low interest rates . . . the Company recognizes other benefits from its affiliation with the REA. If needed, REA provides its borrowers with accounting and engineering services at no charge. . . . REA is also an atypical lender. It is not a profit-maximizing operation. Its

mission is to assist utilities in the provision of telephone and electric service to rural areas, which might otherwise go unserved. Thus, while a major bank might choose to initiate bankruptcy against a utility which defaulted on a loan payment, REA has traditionally not chosen to do so.

Mebane argues that its small size makes inappropriate any comparison between its cost of equity and that of larger companies like Central Telephone and Western & Westco. It also argues that the Commission did not sufficiently consider the thinness of its capital in calculating the risk to its investors. Both of these objections go solely to the weight which the Commission gave the testimony of its expert witness. The credibility of witnesses is a matter for the Commission, and not this Court, to determine. *Utilities Commission v. Telephone Co.*, 281 N.C. at 371, 189 S.E. 2d at 739. The findings of the Commission as to a proper rate of return are supported by competent and substantial evidence. They are therefore binding on appeal. *Utilities Commission v. City of Durham*, 282 N.C. 308, 326, 193 S.E. 2d 95, 107 (1972).

Assignment of error No. 3 is overruled.

For the reasons stated in this opinion the decision of the Court of Appeals affirming the order of the Utilities Commission is

Affirmed.

Justices BRITT and BROCK did not participate in the consideration or decision of this case.