STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; NORTH CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC.; THE CITY OF DURHAM; NORTH CAROLINA OIL JOBBERS ASSOCIATION; JOSEPH L. BERRY; ROBERT AREY; GREAT LAKES CARBON CORPORATION; DUKE UNIVERSITY; HOUSTON V. BLAIR; BETTY MAJETT; AND ROBERT MORGAN, ATTORNEY GENERAL v. DUKE POWER COMPANY

No. 72

(Filed 1 July 1974)

1. Utilities Commission § 6— fixing rates of electric company — fair rate of return on fair value of property

The legislative mandate is that the Utilities Commission shall fix rates which will enable a well managed utility to earn a "fair rate of return" on the "fair value" of its properties "used and useful" in rendering its service, with the factors to be determined as of the end of the test period, the intent of the Legislature being that the Commission fix rates as low as may be reasonably consistent with the requirements of the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution and requirements of Art. I, § 19 of the State Constitution. G.S. 62-133 (b) and (c).

2. Utilities Commission § 6—fair value — weight to be given evidence

It is the clear intent of G.S. 62-133 (b) (1) that the Utilities Commission, in considering the indicators of fair value which themselves are supported by competent and substantial evidence, shall use its own expert judgment as to the credibility of the evidence in the record and as to the weight to be given to it.

3. Electricity § 3; Utilities Commission § 6— replacement cost — weight in determining fair value

While the Utilities Commission may not brush one of the statutorily prescribed indicators of fair value aside by giving it minimal consideration, the Commission did not so treat its finding of "replacement cost" in this instance, having given that indicator a weighting of 28.6%, thereby placing "fair value" at approximately $95,500,000 above original cost, depreciated.

4. Utilities Commission § 9— review of Commission order on appeal

A reviewing court may not properly disturb an order of the Utilities Commission merely because it would have given a different weight to each of the indicators of "fair value."

5. Utilities Commission § 6— fair value — weight to be given indicators

G.S. 62-133 (b) (1) does not require that, in the absence of expert opinion testimony as to the weight to be given the respective indicators of "fair value," the Utilities Commission must give them equal weight and find "fair value" by the mere striking of an arithmetic average of the indicators.

6. Electricity § 3; Utilities Commission § 6— fair value — replacement cost

The present "fair value" of a utility system of generating plants, transmission lines and distribution lines cannot exceed the present cost of constructing a substitute system of modern design, capable of generating and distributing the same quantity of power at less operating expense.

7. Utilities Commission § 6— fair rate of return — fair value of properties used

The concept contained in G.S. 62-133(b) of a fair rate of return on the fair value of the properties used in rendering the service clearly contemplates the allowance of a greater dollar return than would be allowed if the rate base were the original cost, depreciated, of the same properties, assuming that the value of the properties has been enhanced by inflation.

8. Utilities Commission § 6— rate fixing for electric company — statutory formula

The formula of G.S. 62-133(b) is: fair rate of return multiplied by the fair value of the properties equals the fair return in dollars.

9. Utilities Commission § 6— fair rate of return — definition

A "fair rate of return" is one sufficient to enable the utility to attract, on reasonable terms, capital necessary to enable it to render adequate service. G.S. 62-133(b)(4).

10. Electricity § 3; Utilities Commission § 6— fair value increment — inclusion in determining rate of return

The "fair value" increment (fair value of the plant less original cost, depreciated) found by the Utilities Commission must be added to the equity component of the utility company's actual investment in its electric plant, and the utility is entitled, under G.S. 62-133(b), to earn the same rate of return on this increment as it is entitled to earn on the retained earnings (surplus) which it has reinvested in its plant.

11. Utilities Commission § 6— previous finding of fair rate of return — no res judicata

Previous findings by the Utilities Commission that 12% on the common equity component was a fair rate of return for the utility company did not prevent the Commission from finding a lower return on common equity capital fair in the present case.

12. Utilities Commission § 6— fair rate of return — fair value increment excluded in computation — error

The Utilities Commission did not comply with G.S. 62-133(b) in its computation of a fair rate of return for the utility company where the total dollar return which the company was to be permitted to earn had not been increased at all by reason of the fair value increment.

13. Evidence § 47; Utilities Commission § 6— fair value increment — expert testimony prior to determination

In the ordinary rate case where the fair value increment has not been determined at the time the witness is testifying, the witness

may nevertheless be asked to give his opinion as to the probable effect upon the cost of capital of various hypothetical fair value determinations.

APPEAL by Duke Power Company from the Court of Appeals, which affirmed the order of the North Carolina Utilities Commission fixing rates for electric power, Judge Parker dissenting, the opinion of the Court of Appeals being reported in 21 N.C. App. 89, 203 S.E. 2d 404.

On 31 May 1972, Duke Power Company, hereinafter called Duke, filed with the North Carolina Utilities Commission, hereinafter called the Commission, its application for authority to increase its rates for the sale of electric power to retail customers in North Carolina. Attached to the application were rate schedules which Duke proposed to put into effect on its sales to the several classes of its customers, the per cent of increase in such rates over the then existing rates varying from class to class. It was Duke's estimate that the increases proposed by it would yield a total of $29,376,000 in additional revenues from its North Carolina retail sales.

By order of the Commission, the proposed rates were suspended, the proceeding was declared a general rate case and the matter was set for hearing. The Attorney General of North Carolina, the City of Durham, the North Carolina Textile Manufacturers Association, the North Carolina Oil Jobbers Association, the Great Lakes Carbon Corporation and certain individuals intervened in opposition to the proposed increases.

The hearing before the Commission commenced on 8 November 1972 and extended through eighteen hearing days. The evidence introduced by Duke, the several protestants and the staff of the Commission included 1,340 pages of testimony, as condensed in the printed record, and a large number of voluminous statistical exhibits. The evidence dealt with the revenues received and the operating expenses of Duke, both related to retail sales in North Carolina, during the twelve-month test period ending 30 June 1972 (fixed by the Commission pursuant to the motion of Duke) ; the original cost of the properties included in Duke's plant in service allocable to North Carolina operations; the accrued depreciation reserve; the trended original cost of such properties ; a cost of service study made by Duke to determine the appropriate allocation among its several classes of customers of its costs of service, including both its investment

in plant and its operating costs; the alleged merits and demerits of an alternate system of rate schedules, proposed by the Commission staff and designed by it to produce an equal amount of additional revenue but varying the increases to be imposed upon the different classes of customers; the effect of the two sets of proposed rate schedules upon each of the various classes of customers; the earnings required by Duke in order to enable it to attract capital; the present capital structure of Duke; the amount of capital which it must attract in the near future for the construction of additions to plant; the cost of equity capital; the cost of debt capital and numerous other matters bearing upon the reasonableness of the rates which Duke proposed to put into effect.

On 1 January 1973, the Commission not having rendered its decision, Duke put into effect its entire rate proposal, pursuant to the provisions of G.S. 62-133, filing with the Commission its undertaking to refund such part of its proposed increases as might eventually be disapproved.

On 21 June 1973, approximately one year after the filing of the application, the Commission rendered its decision and entered its order authorizing Duke to put into effect rates designed to produce additional revenues (as of the test period) of $21,150,000, this being 72 per cent of the increase proposed by Duke, and directing Duke to file new rate schedules, consistent with the rate design proposed by Duke, which would produce the approved amount of additional revenue. The Commission further ordered Duke to refund to its customers, pursuant to said undertaking, all amounts collected after 1 January 1973 in excess of the increases so approved by the Commission. The Commission further ordered Duke to take certain action with reference to further cost of service studies and with reference to other matters not pertinent to this appeal.

In its order the Commission made 31 findings of fact, the following being those pertinent to this appeal:

"4. That the reasonable original cost depreciated of Duke's electrical plant in service at the end of the test period and subject to Commission jurisdiction is $865,006,125 * * *.

"5. * * * that the Replacement Cost is $1,199,093,357.

"6. * * * that a reasonable working capital allowance to be included in Duke's rate base is $62,416,389.

"7. That considering the reasonable original cost of the property, less that portion of the cost which has been consumed by previous use and recovered by depreciation expense, and considering the replacement cost of said property, the condition of the property, and the outmoded design of some of the older plant, the Commission finds that the fair value of said plant should be derived from giving five-sevenths weighting to original cost (investment) and two-sevenths weighting to replacement cost (trended). By this method, the Commission finds that the fair value of the said plant devoted to retail service in North Carolina is $960,459,620 or $1,022,876,009 including $62,416,389 allowance for working capital.

"11. That Duke Power Company's present level of [generating] reserves is approximately 10 percent; that this level is less than adequate to insure reliable service; and that the amount of investment in generation devoted to use as reserves is not an issue in this proceeding.

"12. That in reference to the future needs for which Duke is presently constructing reserve capacity, the evidence before this Commission at this time is insufficient to determine the most reasonable level of reserves.

"13. That Duke is experiencing increasing costs of supplying service and constructing new capacity and that incremental costs exceed embedded costs.

"14. That expansion of service and replacement of plant under increasing cost conditions results in attrition of earnings.

"16. [That in the test period Duke earned] a rate of return on depreciated original cost of plant of 6.72%; a return on original cost equity of 7.54%; and a return on the fair value of 6.09%. That such rates of return are insufficient to provide a fair profit to Duke's stockholders considering changing economic conditions, and insufficient to allow Duke to compete in the market for capital funds on terms which are reasonable and fair to its customers and existing investors.

"17. That the rate of return necessary on the fair value of Duke's property to allow Duke, with sound management, to produce a fair profit for its stockholders, con-

sidering economic conditions as they exist, to maintain its facilities and service in accordance with its obligation to its customers, and to compete in the market for capital funds on a reasonable basis to customers and stockholders, is 7.05%, which rate of return will produce $21,150,000 of additional gross revenues on North Carolina retail electric service; and that the additional gross operating revenues of $21,150,000 will increase the net income available to the common stockholders * * * to $31,309,147 for a rate of return on book value common equity of 11% and a rate of return on fair value common equity of 8.24%.

"20. That the 1971 Cost of Service Study in evidence in this Docket, including revisals by the Staff, is the best evidence of the costs to Duke Power Company of providing various classes of service, and the results are useful to this Commission in setting rates.

"24. That the use of incremental pricing is based upon sound economic principles, promotes maximum efficiency, and inhibits attrition of earnings; that expansion of service which is priced below the total incremental cost of that expansion will lower the rate of return; and that the expansion of service which is priced above the total incremental cost of that expansion will raise the rate of return.

"25. That Duke's incremental demand cost is approximately $2.30 to $2.85 per kilowatt and its incremental energy cost is approximately .4581¢ per kilowatt hour.

"27. That the rates of return earned by Duke's proposed rates should achieve a more uniform rate of return by classes, and that Duke's proposed procedure for increasing its rates and the resulting rate structure is reasonable and not unduly discriminatory."

From its findings of fact the Commission drew a number of conclusions of which the following are pertinent to this appeal:

"The trended original cost study by Witness Gillett for the applicant has deficiencies which make it unacceptable as a complete and reasonable method for determining replacement cost. The witness, in computing the trended original cost of the properties and subtracting from the figure, thus derived, an allowance for no element of depreci-

ation, save for physical wear and tear, has obviously left out the major factor of obsolesence. While Mr. Gillett did account for advances in the art of construction, he made no attempt to determine the value of the utility plant as if the entire plant were designed in accordance with the present state of the art for the design and operation of electric systems, including modern technologies and efficiencies. The Commission considers the replacement cost more than just a 'brick-for-brick' reproduction cost, and the Commission therefore concludes that the trended original cost method employed by Duke to be insufficient as a complete and reasonable determination of replacement cost.

"The Commission concludes that the replacement cost which was determined merely by trending and depreciating original cost without proper consideration for improvements in plant design and efficiency is excessive. * * *

"The Commission further concludes that the proper weighting, considering depreciated original cost, replacement cost, and the outmoded design of some of the older plant, is five-sevenths weighting of original cost and two-sevenths weighting for replacement cost. By this method, the Commission determines the fair value of the said plant devoted to retail service in North Carolina to be $960,-459,620 or $1,022,876,009 including $62,416,389 allowance for working capital. * * *

* * * *

"The projected construction program is not unreasonable based on a 25 percent reserve margin. However, this Commission is not convinced that a 25 percent reserve margin is necessary or prudent. Present reserve levels are well below the 25 percent range and Duke's planned construction program (which anticipates reaching the 25 percent reserve range) places a large financial burden on the company and its rate payers.

* * * *

"In our order in Docket E-7, Sub 128 [a prior rate case], we found Duke's reasonable common equity cost to be 12 percent, whereas here we find that cost to be 11 percent. During a period when its return has been substantially below 12 percent (7.54% for the test period) Duke has continued to attract very large amounts of capital and

to pay out very substantial dividends to its equity investors, while increasing its retained earnings. Recent experience in the capital markets indicate that very few class A and B utilities are experiencing equity cost above 11 percent, and in the light of all these circumstances, we conclude that 11 percent is a reasonable estimate of Duke's foreseeable equity cost and that such a return will enable it to safely meet its indenture requirements and continue to attract its required equity funds.

"The rates proposed by Duke are found to be unreasonable and unjustified to the extent that they produce any increases in annualized revenue on the customers at the end of the test period in excess of $21,150,000.

"The Commission concludes that an increase of $21,150,000, 72% of the $29,376,000 increase requested in the application, is necessary to maintain Duke's facilities and service in accordance with the reasonable requirements of its customers in North Carolina, and to provide a fair rate of return to Duke on the fair value of its properties used and useful on its property in North Carolina.

\* \* \* \*

"The evidence in this Docket indicates that the Cost of Service Study accurately portrays the relationship of the different classes of service to the costs of providing service to those classes, the revenues derived from such service, and the benefits to the system as a whole. There is no clear evidence that special allowances should be made for any of the major classes of service in the consideration of the rate of return to be earned by that class. \* \* \*

"The Commission concludes that the rates and charges for any class of service should normally recover all the costs, including a reasonable return, of [providing] that service. If all classes of service earn revenues which exactly cover all costs of service, each class will earn the average rate of return, but the Commission concludes that some variation, within a reasonable range, in rates of return between classes, is acceptable and does not necessarily result in discrimination between classes of customers. The Commission further concludes that it is incumbent upon Duke to review its rate structure on a recurring basis in order to achieve a continuing minimum of disparity of rates of return between classes of customers.

"With the above in mind, it is concluded that both Duke's rate design and the Staff's rate design are in the range of reasonableness * * * . However, the Commission concludes that consideration should be given to Duke's many years of expertise in rate design * * * . The Commission therefore concludes that Duke's proposed rate design should be followed.

\*   \*   \*   \*

"The evidence in the record indicates that the Industrial customer class is being subsidized by other rate payers. The evidence also tends to indicate that electricity costs are a relatively small portion of the total production costs in most industries."

Upon these findings of fact and conclusions, the Commission entered its order as above summarized.

Chairman Wooten dissented solely on the ground that the entire increase requested by Duke should have been allowed. That is, he did not dissent from the order insofar as it went in allowing an increase in rates.

Commissioner McDevitt concurred in the order, but in a separate opinion expressed the view that the approved rate increase and previous increases approved by the Commission in former proceedings might not have been necessary had the management of Duke not been guilty of "insufficient planning" of construction in earlier years and had it not engaged "extensively" and "excessively" in non-utility ventures constituting "drains on managerial and company resources which should have been applied exclusively to its primary function as a public utility." In his view, "all of Duke's problems are not due to economic conditions and inflation," and "a substantial portion of the rate increases which it has been necessary to impose upon the ratepayers" could have been avoided "if greater emphasis had been placed by Duke upon planning and timely action with particular reference to generating facilities."

Commissioner Wells, apparently the undesignated author of the majority opinion, also added a separate opinion expressing his own views to the effect that Duke has been exceedingly generous to its now retired former president in paying him "a consultant's salary of $75,000 per year for only minimal services," the Commissioner noting that "Duke's administrative expenses are rising more sharply than any other category of costs."

From the order of the Commission, only Duke appealed to the Court of Appeals and it alone appeals from the decision of that court. The basis of its appeal is thus stated in its supplemental brief filed in the Supreme Court:

"Three questions are presented by Duke's appeal from the Commission Order, namely:

"1. Were the Commission's findings and conclusions with respect to the fair rate of return on the fair value of Duke's utility property used and useful in rendering retail service in North Carolina supported by competent, material and substantial evidence in view of the entire record as submitted?

"2. Did the Commission commit error of law and exceed its statutory authority or jurisdiction by failing to give effect to the statutory mandate that rates must be fixed on fair value?

"3. Were the Commission's findings and conclusion with respect to the fair value of Duke's property used and useful in rendering retail service in North Carolina supported by competent, material and substantial evidence in view of the entire record as submitted?"

*Robert Morgan, Attorney General, I. Beverly Lake, Jr., Deputy Attorney General, and Robert P. Gruber, Assistant Attorney General, for the using and Consuming Public.*

*Edward B. Hipp, Commission Attorney, and John R. Molm, Associate Commission Attorney, for North Carolina Utilities Commission.*

*William H. Grigg, Steve C. Griffith, Jr., Clarence W. Walker, John M. Murchison, Jr., for Duke Power Company.*

*Byrd, Byrd, Ervin & Blanton for Great Lakes Carbon Corporation.*

*Claude V. Jones for the City of Durham, Intervenor.*

LAKE, Justice.

The steps to be taken by the Utilities Commission in fixing rates to be charged by any public utility for its services are set forth in G.S. 62-133 (b), which provides:

"(b) In fixing such rates, the Commission shall:

"(1) Ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or by any other reasonable method.

"(2) Estimate such public utility's revenue under the present and proposed rates.

"(3) Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

"(4) Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

"(5) Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to paragraph (3) of this subsection the rate of return fixed pursuant to paragraph (4) on the fair value of the public utility's property ascertained pursuant to paragraph (1)."

[1]   Thus, the legislative mandate is that the Commission shall fix rates which will enable a well managed utility to earn a "fair rate of return" on the "fair value" of its properties "used and useful" in rendering its service. These factors are to be determined as of the end of the test period. G.S. 62-133(c). This concept of a "fair return on fair value" originated as a constitutional limitation over 75 years ago in *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819. That is, it began as a state-

ment of the minimum below which the Legislature might not go in fixing public utility rates. Immediately thereafter, the Legislature incorporated this standard into the original version of G.S. 62-133(b). With relatively minor amendments, insofar as the present appeal is concerned, the original standard has survived and appears in the present statute. The origin of this statute supports the inference that the Legislature intended for the Commission to fix rates as low as may be reasonably consistent with the requirements of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, those of the State Constitution, Art. I, § 19, being the same in this respect.

After some forty years of struggling, with indifferent success, to give clear meaning to the concept of "a fair return on the fair value," the Supreme Court of the United States abandoned it as a test of due process of law in public utility rate making. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 600-605, 64 S.Ct. 281, 88 L.Ed. 333. Nevertheless, by virtue of the above statute, it remains as the standard to be applied by the Commission in fixing rates and by this Court in determining appeals from the Commission's order.

In *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 344, 80 S.E. 2d 133, Justice Barnhill, later Chief Justice, said, "This statute has been characterized as an 'old, rambling, and misty statutory declaration of the matters to be taken into account by the Commission * * * .' 12 N. C. Law Review 298." Since that time it has frequently been characterized in somewhat less complimentary terms. However, as Justice Barnhill there said, "Be that as it may, it is the law in this State and will continue to be the law until amended, revised, or repealed by the Legislature."

Duke contends that, in its order now before us, the Commission did not comply with the mandate of subparagraph (1) of this statute in fixing the fair value of its properties used and useful in rendering electric power service to the public in North Carolina in that its finding of "fair value" is not supported by substantial evidence. It must be so supported. G.S. 62-65. We turn first to this contention.

Preliminarily, the Commission found that the reasonable original cost, depreciated, of the properties, as of the end of the test period, was $865,006,125, that the "replacement cost" was

$1,199,093,357, that the proper allowance for working capital was $62,416,389. Duke does not challenge these preliminary findings. The finding as to "replacement cost" was derived by the Commission from the testimony of Duke's expert witness, Mr. Gillett, by applying to his trended cost calculations, computed on the basis of all of the company's properties, including those in South Carolina, the allocation factors set forth in evidence introduced by witnesses for the Commission staff. The appropriateness of the allocation factors is not questioned by Duke. Thus, Duke does not question the correctness of a Commission's preliminary finding as to the "replacement cost" of the properties used by Duke in retail service to the people of North Carolina.

Having made these preliminary findings, the Commission then found, or concluded, that the "fair value" of the properties allocated to North Carolina should be derived by giving five-sevenths (71.4%) weighting to original cost (i.e., net investment) and two-sevenths (28.6%) weighting to replacement cost. So doing, and adding to the result the working capital allowance which it had found proper, the Commission found the fair value of the properties (was $1,022,876,009). This figure, called the "rate base," is the amount on which the Commission then undertook to allow Duke to earn a fair return.

Duke contends that there is in the record no evidence to support the Commission's finding of the "rate base" because there is no evidence in the record to support the Commission's selection of the two weighting factors, five-sevenths and two-sevenths, respectively. Our careful study of this voluminous record, and of the well prepared brief filed by Duke, discloses no expert testimony whatever as to the weight which should be given by the Commission to original cost and to replacement cost in carrying out the statutory mandate to "consider" these indicators of "fair value." If such evidence be necessary in order to enable the Commission to give appropriate weight to those two indicators, which we think is clearly not the meaning of the statute, the absence of such evidence in the record does not benefit Duke, for the burden is upon Duke to establish the reasonableness of the rate increases it has proposed. G.S. 62-75; G.S. 62-134 (c) ; *Utilities Commission v. Railway Co.*, 267 N.C. 317, 148 S.E. 2d 210.

[2, 3]　It is the clear intent of G.S. 62-133 (b) (1) that the Commission, in "considering" the indicators of "fair value" which,

themselves, are supported by competent and substantial evidence, shall use its own expert judgment as to the credibility of the evidence in the record and as to the weight to be given to it. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 358, 360, 189 S.E. 2d 705; *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 454, 146 S.E. 2d 487; *Utilities Commission v. Public Service Co.*, 257 N.C. 233, 237, 125 S.E. 2d 457; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co., supra,* at pp. 344, 349. While the Commission may not brush one of the prescribed indicators aside by giving it "minimal consideration," *Utilities Commission v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469, it has not so treated its finding of "replacement cost" in this instance, having given that indicator a weighting of 28.6 per cent, thereby placing "fair value" at approximately $95,500,000 above original cost, depreciated. An addition of over $95,000,000 to the rate base is not "minimal."

[4, 5]  A reviewing court may not properly disturb an order of the Commission merely because it would have given a different weight to each of the indicators of "fair value." *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 339, 360, 189 S.E. 2d 705; *Utilities Commission v. Gas Co.*, 254 N.C. 536, 550, 119 S.E. 2d 469. It is the prerogative of the Commission to determine the credibility of evidence before it, even though such evidence be uncontradicted by another witness. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 360, 189 S.E. 2d 705. Obviously, it is not the meaning of G.S. 62-133(b)(1) that, in the absence of expert opinion testimony as to the weight to be given the respective indicators of "fair value," the Commission must give them equal weight and find "fair value" by the mere striking of an arithmetic average of the indicators. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 358, 189 S.E. 2d 705.

As the Supreme Court of the United States said in *R. R. Commission of California v. Pacific Gas & Electric Co.*, 302 U.S. 388, 397, 58 S.Ct. 334, 82 L.Ed. 319, while it was still struggling with the rule of *Smyth v. Ames, supra:* "The Commission was entitled to weigh the evidence introduced, whether relating to reproduction cost or to other matters. The Commission was entitled to determine the probative force of respondent's estimates."

Furthermore, we find in the evidence presented to the Commission by Duke, itself, ample support for a discounting of

"replacement cost" as an indicator of fair value. Estimates of replacement cost are inherently speculative to a considerable degree. Furthermore, there is abundant evidence in the record, introduced by Duke, to the effect that its many generating plants, which are the bulk, cost-wise, of its plant in service, are different in efficiency. With justifiable pride, Duke points to its Marshall steam plant as the most efficient such plant in the entire electric power industry. Its other fossil fuel burning generating plants are of varying lesser degrees of efficiency. Its older hydroelectric plants are, according to its evidence, used primarily to meet demand peaks. While the record indicates some present misgivings by Duke as to the savings in operating costs to be effected by its presently proposed nuclear generating plants, the company's decision to turn for the future completely to nuclear generation, notwithstanding its far greater capital cost, rather than to duplicates of the Marshall plant, hardly supports Duke's position that the record contains no evidence of substantial obsolescence in its existing plant.

Duke's expert witness on "replacement cost," the only witness on this subject, testified that he arrived at his figure for this indicator of "fair value," which figure was accepted by the Commission, by trending the original cost of construction of the present properties, using modern methods of construction, but not varying the design of the present system. Specifically, Mr. Gillett testified:

"When I said earlier that I used the present state of the art, I am talking about the art of construction. I didn't attempt to design an entire plant on today's state of the art for constructing and operating electric systems designing where the generation would go and what type of generation it would be and how the transmission lines would be laid out and where the substation would be. That would be substitute plant approach, which is a hypothetical situation we didn't indulge in.

"When I say I used the present state [of the] art you are talking about what a *building contractor* would go do if he were building it today. Present construction techniques, *same design* and everything, same original investment trended as if it were built with modern materials and construction equipment and labor. * * *

"I know the Company is going to a long-range program of 100 percent nuclear on new construction and *I know that*

*will have the effect of phasing out steam plant* but they don't have one operating yet." (Emphasis added.)

**[6]**    Quite obviously, the present "fair value" of a utility system of generating plants, transmission lines and distribution lines cannot exceed the present cost of constructing a substitute system of modern design, capable of generating and distributing the same quantity of power at less operating expense. See: Justices Brandeis, Holmes and Stone, dissenting, in *St. Louis and O'Fallon Railway v. United States,* 279 U.S. 461, 488, 517, 49 S.Ct. 384, 73 L.Ed. 798. We find no merit in Duke's contention that the Commission committed an error of law in its respective weightings of original cost, depreciated, and replacement cost in determining Duke's rate base.

We now turn to Duke's contention that the Commission erred in fixing the fair rate of return Duke should be permitted to earn upon the rate base so determined by the Commission.

**[7]**    Here, too, the Commission and this Court are bound by the provisions of G.S. 62-133 (b). The concept therein contained of a fair rate of return on the fair value of the properties used in rendering the service clearly contemplates the allowance of a greater dollar return than would be allowed if the rate base were the original cost, depreciated, of the same properties, assuming, as is here true, that the value of the properties has been enhanced by inflation. Otherwise, the exceedingly costly and laborious determination of "fair value," as distinguished from original cost, depreciated, would be a meaningless exercise. It is not for the Commission, or for this Court, to evade the mandate of the statute by determining the number of dollars which would be a fair return on the original cost, depreciated, and then simply translating that amount into a percentage of "fair value."

**[8]**    The formula of the statutory mandate is: $A \times B = C$ (fair rate of return multiplied by the fair value of the properties equals the fair return in dollars). Obviously, if A and B are varied in exactly inverse proportion, C remains constant (i.e., if $A \times B = C$, then one-third of $A \times 3B$ also equals C).

Duke contends that the Commission first determined the dollar return Duke needs, and should be permitted to earn, by multiplying the original cost, depreciated, by what the Commisson deemed a fair rate of return thereon. Then, says Duke, the Commission increased the rate base to "fair value," but compensated therefor by decreasing the allowable rate of return in the

Utilities Comm. v. Power Co.

exact proportion that it had increased the rate base. To do so would be an error of law, for it would, in effect, obliterate the excess of "fair value" over original cost, depreciated.

In *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 340, 189 S.E. 2d 705, we said:

"The excess of 'fair value,' so ascertained by the Commission, over and above the original cost, less depreciation, is an unrealized paper profit to the utility. * * * Nevertheless, G.S. 62-133 clearly contemplates that this excess shall be included in the rate base of the utility, just as if it were a realized profit invested in additional property used and useful in rendering service to the public. * * * [I]t should be treated by the Commission in a proceeding to fix rates as if it were an addition to the equity component of the utility's capital structure."

[9]  Since the decision of the Supreme Court of the United States in *Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176, it has been accepted that a "fair rate of return" is one sufficient to enable the utility to attract, on reasonable terms, capital necessary to enable it to render adequate service. This is the test laid down by G.S. 62-133 (b) (4).

We do not have before us on this appeal any question as to whether Duke needs to attract the enormous amounts of capital, which its officers testified must be attracted for expansion of its plant to meet anticipated demands for electric service. The Commission concluded that the maintenance of Duke's ability to render adequate service does not require the construction of reserve generating capacity as large as that proposed by Duke. In this Court, Duke does not assert any error in this conclusion. The issuance of securities by a public utility in this State is subject to the approval of the Commission. G.S. 62-161. A utility must commence presently to build plant additions which will be needed for adequate service by the end of the time required for construction. However, a utility may not justify an increase in its rates for service to its present customers by evidence of its present intent to build additions to its plant not reasonably considered necessary for adequate service, including proper reserve capacity, by the end of the time needed for the completion of such additions.

Likewise, we do not have before us on this appeal any question as to the reasonableness of Duke's expenditures for salaries and other operating expenses to which reference was made in the separate opinion of Commissioner Wells. No deduction was made by the Commission from Duke's actual expenditures on this account. Only reasonable expenditures for operating the plant may be charged to the customers. Obviously, rates may not be increased because a utility's board of directors has paid, or proposes to pay, excessive consultant fees to former officers of the company, whether this be due to bad judgment or to a desire to reward the recipient for services previously rendered to stockholders. Such a bonus must be at the expense of the grateful stockholders, not the ratepayers.

Again, this appeal presents for decision no question as to whether Duke's several rate schedules are so designed as to prefer, unduly, one or more classes of customers over others, through failure to charge the favored class the full cost of supplying its demand for service, and so contribute to the attrition of Duke's rate of return as the demand by the favored class increases and requires additions to the plant.

The sole question presented by this contention of Duke is whether the Commission failed to give heed to our decision in *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705, concerning the allowance of a fair return upon the "fair value" increment to the rate base. As we interpret the opinion of the Commission concerning its determination of the fair rate of return, we conclude there is merit in this contention by Duke.

[10] The "fair value" increment (fair value of the plant less original cost, depreciated) found by the Commission was approximately $95,500,000. For rate of return purposes, this increment must be added to the equity component of Duke's actual investment in its electric plant. Duke is entitled, under G.S. 62-133(b), to earn the same rate of return on this increment as it is entitled to earn on the retained earnings (surplus) which it has reinvested in its plant. The wisdom of this statute is not for us or for the Commission. The Legislature has so decreed and its mandate must be observed by the Commission. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 340, 189 S.E. 2d 705.

[11] In the present case, the Commission found that the cost to Duke of common equity capital (i.e., the fair rate of return

thereon) was 11 per cent. The testimony of Dr. Olson, the Attorney General's witness, supports this finding. So does Duke's demonstrated ability to attract huge quantities of capital, both debt and equity, when its earned return on equity capital has been less than 11 per cent. See: *Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151, 163-164, 54 S.Ct. 658, 78 L.Ed. 1182. As noted in Duke's brief and in the dissenting opinion of Chairman Wooten, in two preceding rate cases the Commission had found 12 per cent on the common equity component was a fair rate of return for Duke. Such previous findings are not, however, *res judicata,* even as to what was a fair rate of return on common equity capital as of the dates of those former orders, and such findings do not prevent the Commission from finding a lower return on common equity capital fair in the present case, even though the tide of inflation has continued to rise. "The fixing of a rate of return shall not bar the fixing of a different rate of return in a subsequent proceeding." G.S. 62-133(e). Thus, if the Commission is now of the opinion that in the earlier case it fixed too high a rate of return, it is not thereby precluded from finding a lower rate of return to be fair in the present case.

In the present case, having concluded that a fair rate of return to Duke upon its equity component is 11 per cent, the Commission apparently multiplied the equity component of Duke's actual capital structure (i.e., its common equity capital plus its retained earnings) by 11 per cent and determined that the return of $31,309,147 was a fair return thereon. Adding this to the amount required to pay interest on the debt component and dividends on the preferred stock component of Duke's actual capital structure, the Commission computed that $72,023,404 was a fair dollar return to Duke on its entire actual capital invested in its electric power system. The Commission then made the mathematically correct computation that the return of $31,309,147 is a return of 8.24 per cent on the common equity component of the actual capital structure plus the fair value increment. When taken in conjunction with the interest requirement on debt capital and the dividend requirement on preferred stock capital, this equated to a return of 7.05 per cent on the fair value of the properties, which return the Commission found to be fair.

[12] Obviously, in this computation, the total dollar return which Duke is to be permitted to earn has not been increased at all by reason of the fair value increment. It is exactly the same as the Commission would have allowed if the fair value of the

properties had been exactly the same as Duke's actual net investment in the properties. This is not in accord with the mandate of G.S. 62-133(b), as construed by us in *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705, and, consequently, this proceeding must be remanded to the Commission for compliance with that mandate.

This is not to say that the Commission must now revise its order so as to permit Duke to make an additional increase of its rates sufficient to yield additional net income equal to 11 per cent of the fair value increment. It is for the Commission, not for this Court, to determine what is a fair rate of return. It is evident that in the present case the Commission determined that the fair rate of return on the fair value of Duke's properties was 7.05 per cent through a misunderstanding of our decision in *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705.

As we there said, the capital structure of the company is a major factor in the determination of what is a fair rate of return for the company upon its properties. There are, at least, two reasons why the addition of the fair value increment to the actual capital structure of the company tends to reduce the fair rate of return as computed on the actual capital structure. First, treating this increment as if it were an actual addition to the equity capital of the company, as we have held G.S. 62-133(b) requires, enlarges the equity component in relation to the debt component so that the risk of the investor in common stock is reduced. Second, the assurance that, year by year, in times of inflation, the fair value of the existing properties will rise, and the resulting increment will be added to the rate base so as to increase earnings allowable in the future, gives to the investor in the company's common stock an assurance of growth of dollar earnings per share, over and above the growth incident to the reinvestment in the business of the company's actual retained earnings. As indicated by the testimony of all of the expert witnesses, who testified in this case on the question of fair rate of return, this expectation of growth in earnings is an important part of their computations of the present cost of capital to the company. When these matters are properly taken into account, the Commission may, in its own expert judgment, find that a fair rate of return on equity capital in a fair value state, such as North Carolina, is presently less than 11 per cent. This is for the Commission, not for this Court, to determine.

[13]   As we observed in *Utilities Commission v. Telephone Co.*, 381 N.C. 318, 372, 189 S.E. 2d 705, since a witness cannot, prior to the Commission's determination of the fair value increment, know the exact capital structure of the utility, for rate making purposes, the witness ordinarily computes the cost of capital (i.e., the fair rate of return) on the basis of the company's actual capital structure. His computation of the cost of capital must be adjusted by the Commission in order to take into account the effect of the fair value increment on the fair rate of return. If the Commission now holds a further hearing of Duke's application involved in this appeal, such witness would then know the fair value increment, which has now been determined, and could testify as to the effect, which, in his opinion, such increment would have on the cost of capital. In the ordinary rate case, where the fair value increment has not been determined at the time the witness is testifying, the witness may nevertheless be asked to give his opinion as to the probable effect upon the cost of capital of various hypothetical fair value determinations. This procedure the Commission may see fit to use in future rate cases.

The judgment of the Court of Appeals is, therefore, reversed and this matter is remanded to that court with direction that it enter its judgment further remanding the matter to the Utilities Commission for further proceedings by the Commission not inconsistent with this opinion.

Reversed and remanded.